#29205, #29206-r-SRJ
**2020 S.D. 61**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

| | |
|---|---|
| STATE OF SOUTH DAKOTA, | Plaintiff and Appellant, |
| v. | |
| CARRIE LYNN OSTBY, | Defendant and Appellee. |

----------------------------------------------------------------------------------------------------

| | |
|---|---|
| STATE OF SOUTH DAKOTA, | Plaintiff and Appellant, |
| v. | |
| DANA OLMSTED, | Defendant and Appellee. |

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ERIC STRAWN
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota

BRENDA K. HARVEY of
Lawrence County State's
   Attorney's Office                  Attorneys for plaintiff and
                                                  appellant.

ARGUED
OCTOBER 7, 2020
OPINION FILED **11/04/20**

ELLERY GREY of
Grey & Eisenbraun Law
Rapid City, South Dakota

Attorneys for defendant and appellee Carrie Ostby.


ROBERT D. PASQUALUCCI of
Pasqualucci Law
Rapid City, South Dakota

Attorney for defendant and appellee Dana Olmsted.

#29205, #29206

JENSEN, Justice

[¶1.] Carrie Lynn Ostby and Dana Olmsted were separately indicted on felony-controlled substance charges. Ostby and Olmsted filed motions to suppress evidence seized by law enforcement, pursuant to a search warrant, at the apartment where Ostby and Olmsted resided. The motions alleged that the affidavit supporting the search warrant did not show probable cause for the search. Ostby and Olmsted also argued that exigent circumstances did not exist to search the apartment. The circuit court sustained both motions to suppress. We granted the State's petitions for intermediate appeal of both rulings. The cases are consolidated for the purpose of considering the appeals. We reverse the suppression orders.

**Facts and Procedural History**

[¶2.] On March 20, 2019, at around 5:45 p.m., Deadwood police officers responded to a report of possible illegal drug activity associated with Apartment 15 located at 53 Dunlap Avenue, in Deadwood, South Dakota. After a failed attempt to speak with the occupant, officers gained entry into Apartment 15 and detained a male subject inside the apartment. Subsequently, Officer Erik Jandt submitted a search warrant request to a magistrate judge. Officer Jandt signed the affidavit in support of the warrant, presenting the following facts.

[¶3.] On March 20, 2019, April Roberts contacted the Deadwood Police to report that she had found a baggie that she suspected contained methamphetamine in a dryer of the apartment building at 53 Dunlap Avenue in Deadwood, South Dakota. After the officers arrived, Roberts told them that she was doing laundry

-1-

and needed to use the clothes dryer located in a common area of the apartment building, but there were clothes left inside the dryer. Roberts reported that she knocked on the door of Apartment 15 and asked the male occupant to remove the clothes from the dryer. After he removed the clothes, Roberts looked inside the dryer and found a baggie with a substance she believed was methamphetamine. The substance tested positive for methamphetamine in a field test conducted by Officer Jandt. Roberts also told the officers that a month earlier, she had found a small baggie that she believed contained methamphetamine in the hallway of the apartment building where the dryer was located, and that she reported it to law enforcement. Roberts had also reported that there was "heavy short-term traffic" in and out of Apartment 15.

[¶4.] After speaking with Roberts, the officers knocked on the door of Apartment 15. A male voice inside yelled, "Who is it?" Officer Jandt responded that it was the police. No response was heard from inside the apartment, but the officers could hear someone walking around inside. The officers then obtained a key from the property manager to gain access to Apartment 15. The officers detained the male individual, identified as Dana Olmsted, transported him to the Lawrence County jail, and arrested him for possession of a controlled substance and possession of drug paraphernalia.

[¶5.] Officer Jandt was also aware of information from Drug Investigator James Olson, who was actively working a drug investigation involving Apartment 15. Olson knew that the apartment was rented by Ostby and was aware of the report, made by Roberts, of heavy foot traffic in and out of Apartment 15. As part of

Olson's investigation, he observed a male subject arrive at "Ostby's residence and go inside with the vehicle running and the driver's door open." The male subject was in the residence "approximately 2 minutes." The subject was later stopped for a traffic violation and arrested for possession of methamphetamine. Olson also received unconfirmed information that Ostby had been distributing methamphetamine.

[¶6.] The affidavit requested to search Apartment 15 and Ostby's vehicle for illegal drugs. The affidavit also requested permission to take urine samples from both Ostby and Olmsted. The reviewing magistrate judge found probable cause for the search warrant and granted the request.

[¶7.] The subsequent search of the apartment produced several bags containing a white crystal substance, which was later confirmed to be methamphetamine. The urine samples taken from Ostby and Olmsted both tested positive for methamphetamine. The search of Ostby's vehicle did not result in the discovery of any contraband.

[¶8.] On March 27, 2019, Olmsted was indicted and charged with one count of possession of a controlled drug or substance. On April 24, 2019, Ostby was indicted on one count of unauthorized ingestion of a controlled substance. She was subsequently charged, by superseding indictment, with unauthorized ingestion of a controlled substance, possession of a controlled drug or substance, and possession of a controlled drug or substance with the intent to distribute.

[¶9.] On July 9, 2019, Olmsted filed a motion to suppress evidence. He argued that probable cause did not exist to issue a search warrant for the

apartment, and that there were no exigent circumstances for the search in the absence of a valid warrant. Olmsted requested that "all evidence seized as a result of his stop, detention, and search of his residence be suppressed."[1] On July 24, 2019, Ostby joined the motion to suppress filed by Olmsted.

[¶10.] The State responded that probable cause existed for the issuance of a search warrant, and that exigent circumstances existed to search the apartment without a warrant. Alternatively, the State argued that suppression was not a proper remedy if probable cause did not exist for the search warrant because Officer Jandt had a good-faith belief that the warrant was valid.

[¶11.] On September 10, 2019, Officer Jandt testified at an evidentiary hearing held on both motions to suppress. The circuit court filed memorandum decisions granting the motions on November 25, 2019. The circuit court determined probable cause did not exist for the search warrant, and that the exigent circumstances exception to the warrant requirement was inapplicable. The circuit court did not address the good-faith exception raised by the State.

[¶12.] The circuit court entered separate orders granting the motions to suppress. The State timely filed petitions for permission to appeal both intermediate orders on December 21, 2019. This Court granted both petitions on January 30, 2020. The State raises the following issues as to both suppression orders:

---

1.    The parties did not argue, and the circuit court did not address, whether probable cause existed for the search of Ostby's vehicle or to take urine samples from Ostby and Olmsted. We do not express any opinion whether probable cause existed for the search of the vehicle or the urine samples.

I.    Whether the affidavit in support of the search warrant established probable cause to search Apartment 15.

II.   Whether the good-faith exception applies to the exclusionary rule, if the search warrant is determined to be invalid.

**Analysis and Decision**

I.    ***Whether the affidavit in support of the search warrant established probable cause to search Apartment 15.***

[¶13.]    "We review the issuing court's probable cause determination independently of any conclusion reached by the judge in the suppression hearing." *State v. Gilmore*, 2009 S.D. 11, ¶ 7, 762 N.W.2d 637, 641.  Our review of the probable cause determination of the issuing magistrate judge is deferential. "Reviewing courts are not empowered to conduct an after-the-fact de novo probable cause determination; on the contrary, the issuing judge's legal basis for granting the warrant is examined with 'great deference.'"  *State v. Raveydts*, 2004 S.D. 134, ¶ 8, 691 N.W.2d 290, 293 (quoting *State v. Jackson*, 2000 S.D. 113, ¶ 9, 616 N.W.2d 412, 416).  "A deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant."  *Id.* (quoting *Jackson*, ¶ 9, 616 N.W.2d at 416).  "On review, we are limited to an examination of the facts as contained within the four corners of the affidavit."  *Gilmore*, 2009 S.D. 11, ¶ 7, 762 N.W.2d at 641.

[¶14.]    In determining whether probable cause exists to support the issuance of a search warrant, "[t]here must be 'a showing of probability of criminal activity.'" *State v. Tenold,* 2019 S.D. 66, ¶ 30, 937 N.W.2d 6, 14 (quoting *State v. Helland*, 2005 S.D. 121, ¶ 16, 707 N.W.2d 262, 269).  "[T]he judge must be able 'to make a

practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [the judge], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983)). This Court, in *Gilmore*, explained that "these elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case" but "as closely intertwined issues that may" aid in the finding of probable cause. 2009 S.D. 11, ¶ 11, 762 N.W.2d at 642 (quoting *Gates*, 462 U.S. at 230, 103 S. Ct. at 2328).

[¶15.] "Probable cause cannot be determined by some 'formulaic solution.'" *State v. Dubois*, 2008 S.D. 15, ¶ 11, 746 N.W.2d 197, 202 (quoting *Helland*, 2005 S.D. 121, ¶ 15, 707 N.W.2d at 268). It "'is a fluid concept—turning on the assessment of probabilities in particular contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" *State v. Running Shield*, 2015 S.D. 78, ¶ 9, 871 N.W.2d 503, 506 (quoting *Jackson*, 2000 S.D. 113, ¶ 22, 616 N.W.2d at 420). We look "at the totality of the circumstances to decide if there was at least a 'substantial basis' for the issuing judge's finding of probable cause." *Tenold*, 2019 S.D. 66, ¶ 28, 937 N.W.2d at 14 (quoting *State v. Boll*, 2002 S.D. 114, ¶ 44, 651 N.W.2d 710, 721 (Konenkamp, J., concurring specially)). The "totality of the circumstances" test requires us to look at the evidence contained in the affidavit in its entirety—the "whole picture"—rather than at each piece of the evidence in

isolation. *State v. Barry*, 2018 S.D. 29, ¶ 22, 910 N.W.2d 204, 212 (quoting *District of Columbia v. Wesby*, __ U.S. __, __, 138 S. Ct. 577, 588, 199 L. Ed. 2d 453 (2018)).

[¶16.] Officer Jandt's affidavit relied heavily on information he received from Roberts. This Court has "recognized two inquiries crucial to a probable cause determination in cases when an informant's tip is involved." *Tenold*, 2019 S.D. 66, ¶ 34, 937 N.W.2d at 16. "First, an 'explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [the informant's] tip to greater weight than might otherwise be the case.'" *Id* (quoting *Raveydts*, 2004 S.D. 134, ¶ 11, 691 N.W.2d at 295). "Second, the extent to which the tip is corroborated by the officer's own investigation is important." *Id.* (quoting *Raveydts*, 2004 S.D. 134, ¶ 12, 691 N.W.2d at 295). "However, not every piece of information provided by an informant requires corroboration. 'Because an informant is right about some things, he is more probably right about other facts[.]'" *Gilmore*, 2009 S.D. 11, ¶ 16, 762 N.W.2d at 643 (quoting *Gates*, 462 U.S. at 281, 103 S. Ct. at 2355).

[¶17.] Furthermore, we consider a known informant, who observed the activity firsthand to be more reliable. An informant "whose identity is known, who personally observes the alleged criminal activity, and who openly risks liability by accusing another person of criminal activity [ ]may not need further law enforcement corroboration." *Dubois*, 2008 S.D. 15, ¶ 15, 746 N.W.2d at 203 (quoting *State v. Griggs*, 34 P.3d 101, 104 (Mont. 2001)).

[¶18.] The circuit court concluded that Roberts's tip could not establish probable cause for the search warrant because law enforcement failed to "confirm

the tips through personal observations of criminal activity, or in the alternative, be aware that the tipster has special training or experience relating to the conclusion at issue." In reaching this conclusion, the circuit court erroneously relied on language from *State v. Sharpfish*, wherein this Court, in discussing reasonable suspicion, stated that when an *unknown* informant does not give "explicit and detailed description of alleged wrongdoing," . . . "[t]he officer must confirm the tip through personal observations of criminal activity, or in the alternative, be aware that the tipster 'has special training or experience relating to the conclusion at issue.'" 2019 S.D. 49, ¶ 27, 933 N.W.2d 1, 10 (citation omitted).

[¶19.] However, *Sharpfish* is inapplicable to the circumstances here because Roberts was a known informant. She identified herself to law enforcement and met with them at the apartment building. *See United States v. Robertson*, 39 F.3d 891, 893 (8th Cir. 1994) (holding that the credibility of an anonymous informant was verified based on a face-to-face meeting with the officer and the officer's training and experience in interviewing "hundreds of defendants and informants"). Roberts also provided law enforcement with an "explicit and detailed description of the wrongdoing" when she reported her firsthand observations and her finding of the baggie immediately after Olmsted removed his laundry from the dryer.

[¶20.] Additionally, much of the information provided by Roberts was corroborated by law enforcement. Law enforcement personally observed the baggie and preliminarily confirmed that it contained methamphetamine. Law enforcement's ability to verify this information suggests that Roberts may have also properly identified that the baggie she found in the hallway of the apartment

building, a month earlier, contained methamphetamine. Roberts's report that a male in Apartment 15 had removed the laundry in the dryer was also partially corroborated when the officers knocked on the door of the apartment, and a male inside asked who was there. The information that Roberts had observed "heavy short-term traffic" coming from Apartment 15 was also partially corroborated by Investigator Olson, who personally observed an individual arrive at the apartment building, leave his car running and door open, and return to the vehicle two minutes later. This individual was later stopped for a traffic violation and arrested for possession of methamphetamine. Under these circumstances, the reviewing magistrate judge could appropriately find the "veracity" and "basis of knowledge" for Roberts's information to be reliable.

[¶21.] Ostby and Olmsted, however, argue that even if the magistrate judge could rely on the information provided by Roberts, the circuit court's suppression rulings should be affirmed because there was an insufficient nexus between this information and the request to search Apartment 15. *Guthrie v. Weber*, 2009 S.D. 42, ¶ 11, 767 N.W.2d 539, 543 (stating that "[t]he Fourth Amendment requires that there be a nexus between an item to be seized and the alleged criminal activity"). They highlight that both bags of methamphetamine Roberts purportedly found were located in common areas of the apartment building, and the prior arrest of a person found to possess methamphetamine after entering the apartment building was not "directly linked . . . or traceable" to Apartment 15.

[¶22.] Ostby's and Olmsted's arguments presuppose both a heightened standard for probable cause and a piecemeal approach to reviewing the facts in the

affidavit. But Roberts's discovery of the baggie of methamphetamine in the dryer provided a direct connection between the criminal activity—the baggie of methamphetamine found in the dryer—and the male occupant in Apartment 15. Additionally, the reviewing magistrate could have also considered the other information provided by Roberts and the investigation of Investigator Olson to find a probability of ongoing drug activity connected with Apartment 15. Finally, the magistrate judge could have also drawn inferences from the male occupant's failure to open the door after law enforcement knocked on the door of Apartment 15 and identified themselves, as contrasted with his willingness to respond to and communicate with Roberts when she knocked on the door a short time before.[2] "[W]e will draw every reasonable inference possible in support of the issuing court's determination of probable cause to support the warrant." *Dubois*, 2008 S.D. 15, ¶ 11, 746 N.W.2d at 203 (citation omitted). The affidavit, and the reasonable inferences drawn therefrom, provided the reviewing magistrate with a sufficient basis to conclude that the information was reliable, and that there was a "fair probability" that contraband would be found in Apartment 15.

---

2.  Ostby and Olmsted claim that Officer Jandt's body camera footage, presented at the suppression hearing, showed that Roberts was confused about the apartment where Olmsted was located, but this claim is not supported by the footage itself. More importantly, none of these additional facts are relevant to our determination, as they were not presented to the magistrate at the time he granted the search warrant. "[T]he existence of probable cause for the search warrant must rise or fall on the affidavit itself which was the only evidence presented to the magistrate for his determination of probable cause." *Jackson*, 2000 S.D. 113, ¶ 11, 616 N.W.2d at 416 (quoting *State v. Smith*, 281 N.W.2d 430, 433 (S.D. 1979)).

[¶23.]     Ostby and Olmsted also ask us to review the circuit court's conclusion that exigent circumstances did not exist for law enforcement to search Apartment 15; however, the State has not challenged this determination, and the question of exigent circumstances is not before us.[3]  Finally, having determined that probable cause existed for the issuance of the search warrant, it is unnecessary to consider whether the good-faith exception applies to the exclusionary rule.

[¶24.]     We reverse the circuit court's suppression orders and remand for further proceedings.

[¶25.]     GILBERTSON, Chief Justice, and KERN, SALTER, and DEVANEY, Justices, concur.

---

3.     The underlying premise of this argument from Ostby and Olmsted is that law enforcement's initial entry into Apartment 15 was illegal.  However, the question of probable cause for the search warrant does not turn on legality of law enforcement's initial entry into Apartment 15.  Even "when a search warrant is based partially on tainted evidence and partially on evidence arising from independent sources, '[if] the lawfully obtained information amounts to probable cause and would have justified issuance of the warrant apart from the tainted information, the evidence seized pursuant to the warrant is admitted.'"  *Tenold*, 2019 S.D. 66, ¶ 27, 937 N.W.2d at 14 (citation omitted).  The only information included in the affidavit, derived from the initial entry into Apartment 15, was Olmsted's identity and that a knife inside the apartment was holding the door shut.  We have not relied on either fact in our review of the probable cause determination.